IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| RUSSELL A. REES, | ) | Case No. 1:21-CV-02215 |
| | ) | |
| Plaintiff, | ) | JUDGE DAVID A. RUIZ |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | THOMAS M. PARKER |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff, Russell Rees, seeks judicial review of the final decision of the Commissioner of Social Security, denying his application for supplemental security income ("SSI") under Title XVI of the Social Security Act.  Rees argues that a remand under Sentence Six of 42 U.S.C. § 405(g) is necessary so that an Administrative Law Judge ("ALJ") can consider new, material evidence.  Rees also contests the ALJ's negative findings, contending that the ALJ's residual functional capacity ("RFC") finding as to his mental health limitations was not supported by substantial evidence.

A remand pursuant to Sentence Six is not warranted because Rees has not established that the evidence upon which he seeks a remand is "new" or that "good cause" excuses his failure to present the evidence at the administrative hearing level.  However, because the ALJ failed to apply proper legal standards in determining Rees's RFC, I recommend that the Commissioner's final decision denying Rees's application for SSI be vacated and that Rees's case be remanded for further consideration.

## I.      Procedural History

Rees applied for SSI on March 5, 2018.  (Tr. 238-243).[1]  Rees alleged that he became disabled on July 13, 2017, due to: (i) social anxiety disorder, (ii) depression, and (iii) heart failure.  (Tr. 265, 279).  The SSA denied his application initially and upon reconsideration. (Tr. 80-93, 96-109).  Rees requested an administrative hearing.  (Tr. 236-237).

On July 17, 2019, ALJ Joseph Rose heard Rees's case and denied his claim in an August 29, 2019 decision.  (Tr. 37-56, 114-124).  The Appeals Council remanded the case back to the ALJ because he did not consider evidence of worsening symptoms submitted by Rees prior to the issuance of his decision.  (Tr. 129-132).

On August 12, 2020, Rees requested that the ALJ keep the record open after the hearing, scheduled for August 19, so that a report from Benjamin Rubin, his counselor, could be obtained and submitted.  (Tr. 349).

On August 19, 2020, the ALJ reheard Rees's case, during which the ALJ agreed to leave the record open until August 31, 2020.  (Tr. 57-79).

On September 18, 2020, Rees requested for the record to remain open until September 23, 2020, explaining that Rubin had not seen the request and, due to staffing issues, his counsel had failed to follow up with Rubin sooner.[2]  (Tr. 355-356).

On October 15, 2020, the ALJ issued a written decision, denying Rees's application. (Tr. 21-31).  At Step Four of the sequential evaluation process, the ALJ determined that Rees had the RFC to perform medium work with the following exceptions:

> [Rees] is further limited to performing simple tasks and following simple instructions in an environment with few, if any, workplace changes; occasionally interacting with the

---

[1] The administrative transcript appears in ECF Doc. 6.

[2] Based on Rees's representations in his brief, it appears that the ALJ granted this request.  *See* ECF Doc. 10 at 11.

> general public and coworkers, and on a superficial basis; and no strict production quotas such as assembly line work.

(Tr. 28).  Based on vocational expert testimony that a hypothetical individual with Rees's age, experience, and RFC could work as a garment sorter, classifier, or bagger, the ALJ determined that Rees was not disabled.  (Tr. 30).  The Appeals Counsel declined further review, rendering the ALJ's decision the final decision of the Commissioner.  (Tr. 1-3).  On November 11, 2021, Rees filed a complaint to obtain judicial review.  ECF Doc. 1.[3]

## II.  Evidence

### A.  Personal, Educational, and Vocational Evidence

Rees was born on February 9, 1977 and was 40 years old on the alleged onset date. (Tr. 279).  He completed high school in 1996 and had previously worked in general maintenance and as a line worker for a mail company.  (Tr. 266).

### B.  Relevant Medical Evidence

Because the focus of Rees's argument is the ALJ's consideration of his mental health conditions, the court will summarize only the medical evidence relevant to Rees's mental health.

On May 15, 2017, Rees saw Rajesh Tampi, M.D., for a pharmacological management session.  (Tr. 474).  Rees reported that his mood had been "okay," but he did not notice a difference with the increased dosage of Latuda.  (Tr. 476).  He reported his mood as 7 out of 10 and had recently been around a 7.  *Id.*  He indicated his mood did not get as bad as it used to, but his anxiety worsened when he visited the hospital, and he did not do much to test his anxiety.  *Id.* He reported that he spent a lot of time at home playing video games, but that he did go to alcohol support meetings.  *Id.*  Rees also indicated that he had been sleeping well but would occasionally

---

[3] This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b).

sleep during the day and wake up at night. *Id.* His appetite had been okay. *Id.* He reported that he wishes he "wasn't here" but denied any intent to hurt himself. *Id.*

Dr. Tampi observed that Rees was adequately groomed, cooperative, and fully oriented. *Id.* He also noted that Rees had spontaneous, normal speech; logical, organized thought processes; no evidence of paranoia, delusions, or perceptual disturbances; a full affect; sustained attention and concentration; normal memory; and fair insight and judgment. *Id.* His impression was that Rees had a stable mood, was coping better, and his "adjustment [was] improving." (Tr. 477). He diagnosed Rees with moderate major depressive disorder with recurrent episodes, general anxiety disorder, and alcohol use disorder that was in sustained remission. *Id.* He continued Rees's medications. *Id.*

On May 19, 2017, Rees saw Benjamin Rubin, LISW, for psychiatric counseling. (Tr. 467). Rubin noted Rees's goals were to stop having mood swings, abstain from alcohol, and decrease his anxiety, which he was making progress towards. (Tr. 468). Rees reported that his sleep had improved, he had been sober for four months, his social anxiety had mildly decreased, and he felt his mood had improved. *Id.* He reported that his mood was 7 out of 10 and his anxiety was 6.5 out of 10. *Id.* Rubin observed that Rees was well groomed, cooperative, and fully oriented. *Id.* He also noted that Rees had spontaneous, normal speech; a logical, organized thought process; tight associations; no abnormal thought processes; good insight and judgment; normal memory; sustained attention and concentration; appropriate language; an "okay" fund of knowledge; a euthymic, anxious mood; and a full affect. (Tr. 468-469). Rubin's impression was that Rees was coping better. (Tr. 469).

On July 12, 2017, Rees had a counseling session with Rubin. (Tr. 460). Rees reported that his sleep had improved, he maintained his sobriety, he was compliant with his medications,

his social anxiety had mildly decreased because he often stayed home, and his mood had improved.  *Id.*  He also reported being bored at home.  *Id.*  Rubin's observations were, generally, unchanged and his impression was that Rees was coping better.  (Tr. 461).  He did note, however, that Rees appeared anxious.  (Tr. 460).

On August 17, 2017, Rees met with Dr. Tampi for a pharmacological management session.  (Tr. 450).  As part of the session, Rees completed a Patient Health Questionnaire, indicating he felt or experienced the following: several days of decreased interest/pleasure; down, depressed, or hopeless nearly every day; problems sleeping nearly every day; tired or had little energy several days; never had a poor or excessive appetite; issues with his self-worth several days; trouble concentrating several days; never was lethargic/restless; suicidal ideations nearly every day; and these made his life very difficult.  *Id.*

During the session, Rees reported that things were "okay," and that he was not doing anything fun.  (Tr. 451).  He was playing videogames and he reported his mood as 6 out of 10.  *Id.*  He was not sure why his mood had gone from a 7 to a 6 and indicated that he experienced a lot of boredom because he didn't get out much, although he went to Alcoholics Anonymous twice a week.  *Id.*  Rees also did not report any side effects from his medication, indicating that they helped "a little bit" with his mood and his ability to leave the house.  *Id.*  He reported that he had a lot of social anxiety, especially when talking with others.  *Id.*  As to his suicidal ideation, he stated that he had no active intent to hurt himself but, almost daily, he had thoughts that he would be better off dead.  *Id.*  Videogames and sleep helped distract him.  (Tr. 452).  He spent most of his time by himself, but his family cared about him and wanted him around.  *Id.*  He slept hard but had trouble getting to sleep.  *Id.*

5

Dr. Tampi observed that Rees was adequately groomed, cooperative, and fully oriented. *Id.* His other observations were largely the same as Rubin had noted, with Rees reporting that his mood was 6 out of 10. *Id.* Dr. Tampi's impression was that Rees's mood was stable, he was coping better, and his adjustment was improving. *Id.* His diagnoses remained the same, and he continued Rees's medication. (Tr. 452-453).

On September 20 and November 29, 2017, Rees saw Rubin for additional counseling sessions. (Tr. 436, 443). During his September 20 session, Rees reported that he was considering group therapy and he felt that his social phobia had improved. (Tr. 443). Rubin's observations were largely unchanged, and his impression was that Rees continued to be "coping better." (Tr. 437, 444). During the November 29 session, Rubin also noted that Rees's social anxiety needed continued treatment. (Tr. 437).

On December 14, 2017, Rees met with Dr. Tampi. (Tr. 425). Rees reported that things were about the same, his depression was not bad but lingered, and he was having trouble sleeping, getting only about four hours a night. (Tr. 426). He indicated that, at the moment, his depression was worse, and his anxiety was based mainly on social settings. (Tr. 427). As to his conditions, Rees reported that he was tolerating his medication without any side effects, but it was impacting his appetite, which was otherwise good. *Id.* He reported that he continued living with his sister, was going to therapy, and felt uncomfortable at times due to his social anxiety. *Id.* He denied suicidal intent, but noted he had thoughts that "life suck[ed]." *Id.* He also reported keeping himself busy playing videogames and watching the news. *Id.* Dr. Tampi's observations and impression remained unchanged, but he additionally diagnosed Rees with insomnia. (Tr. 427-428). He increased Rees's Latuda and started him on Ambien to help with his sleep. (Tr. 428).

On January 26, 2018, Rees saw Rubin for counseling.  (Tr. 417).  Rees reported experiencing symptoms of restlessness and that he stopped taking one of the medications he thought was causing it, although he also thought it could be caused by Latuda.  (Tr. 418).  Rubin noted that Rees made progress towards his goals but that the symptoms "waxed and waned."  *Id.* Rubin's observations were unchanged.  (Tr. 418-419).  Rubin's clinical impression, however, was that Rees had "[s]ignificant new stressors."  (Tr. 419).

On March 8, 2018, Rees saw Dr. Tampi.  (Tr. 407).  He reported that things were "okay," his mood was about the same, he no longer experienced akathisia, his sleep had improved with Ambien, and his appetite was okay.  (Tr. 408).  He indicated he still had the same thoughts about suicide without any intentions.  *Id.*  He also noted that he spent most of his time in the basement of the house he lived in watching television and that he did not go out often, but he still went to AA meetings.  (Tr. 409).  Rees reported that his mood was 4 out of 10.  *Id.*  Dr. Tampi's observations about Rees's mental state were largely the same as from their prior appointment. *Id.*  Dr. Tampi's impression was that Rees's mood was stable.  *Id.*  He did not alter Rees's diagnoses and increased Rees's Geodon dosage for his depression.  *Id.*

On March 9, 2018, Rees saw Rubin for a counseling session.  (Tr. 399).  Rubin noted that Rees had made mild progress over the course of treatment towards his goals, and Rees reported being "pretty well."  *Id.*  In his mental status exam, Rubin reported that Rees was well groomed, cooperative, and fully oriented.  (Tr. 400).  He also observed that Rees had spontaneous, normal speech; a logical and organized thought process; tight associations; no abnormal thought processes; fair judgment and insight; normal memory; sustained attention and concentration; appropriate language, euthymic mood, and a full affect.  *Id.*  Rubin's clinical impression was that Rees was mildly coping better.  (Tr. 401).

On June 7, 2018, Rees saw Dr. Tampi for a pharmacological management session. (Tr. 696). Rees reported that "things are going okay," he sometimes forgot to take the second dose of Geodon, and his depression was "something that he still feels." (Tr. 697). He indicated that he did not feel like harming himself, his depression was not as bad, and his medication was helping, noting he had fewer issues going outside but still had a hard time talking to people. *Id.* He reported that his sleep was okay, but he occasionally had a hard time getting to sleep. *Id.* He also indicated that he maintained his sobriety and had been doing okay without AA meetings. *Id.* Dr. Tampi's observations were the same as from Rees's prior appointment, and his impression was that Rees's mood was stable. (Tr. 697-698). His diagnoses also remained unchanged, and he continued Rees's medication, increasing his Geodon dosage. (Tr. 698).

On May 11, 2018, Rees saw Rubin for a counseling session. (Tr. 706). Rees did not report any significant changes, noting he did not always keep up with his medications, but his mood had improved, and his anxiety was moderate. *Id.* Rubin's observations were unchanged, and his impression was that Rees was "coping better, mildly." (Tr. 707).

On August 28, 2018, Rees saw Rubin again. (Tr. 786). Rubin indicated that Rees had progressed towards his treatment goals. *Id.* Rees reported that his parents had got a dog, which he tried to see at least once a week; he was working on exposure therapy; and his social anxiety had decreased. *Id.* He also reported that he stopped taking Geodon about three weeks prior because of akathisia. *Id.* Rubin's observations remained unchanged, and his impressions were that Rees was "coping better, overall. Does report some recent depression." (Tr. 787).

On October 4, 2018, Rees saw Swapnil Khurana, M.D., for a pharmacologic management session. (Tr. 803). Rees reported that he did not have panic attacks, but still had depression, anxiety, loss of interest, okay sleep, low energy, poor concentration, and an okay appetite.

(Tr. 804).  He also indicated he isolated himself and had passive suicidal intent, without any intent or plan.  *Id.*  He reported being compliant with his medications but thought they were not helpful, and went to therapy, which he did find helpful.  *Id.*

Dr. Khurana observed that Rees was poorly groomed, cooperative, and fully oriented.  *Id.* He noted that Rees had spontaneous, normal speech; logical, organized thought processes; no paranoia, delusions, or perceptual disturbances; a depressed mood; a constricted affect; sustained attention and concentration; normal memory; and fair insight and judgment.  *Id.*  Dr. Khurana's clinical impression was that Rees's mood was stable, but his diagnostic impression was that his mood was depressed, and he had passive suicidal ideation, social anxiety, and improved sleep. (Tr. 805).  His diagnoses remained unchanged from Dr. Tampi's findings.  *Id.*  He continued Rees's medications, taking him off Geodon due to the akathisia, reducing his Ambien, and starting him on Wellbutrin for his depression.  *Id.*

On October 24, 2018, Rees saw Rubin for a counseling session.  (Tr. 811).  Rees reported that he had been trying to push himself to get out of the house more, he enjoyed October, and he complied with his medications.  *Id.*  Rubin noted Rees had progressed in his goals and recommended that he go back to AA.  (Tr. 811).  His observations and impression were unchanged.  (Tr. 812).

On November 16, 2018, Rees saw Rubin for a counseling session.  (Tr. 827).  Rees reported that Wellbutrin appeared to be helping, as he felt calmer and had more interest in things. *Id.*  Rubin noted that Rees was progressing towards his goals, improving in his hygiene, and again recommended returning to AA.  *Id.*  Rubin's observations did not change, and his clinical impression was that Rees was "coping better."  (Tr. 829).

On January 4, 2019, Rees saw Rubin for a counseling session.  (Tr. 834).  Rubin's noted that Rees was progressing towards his goals, and Rees reported feeling better, enjoying having a dog and playing videogames, that his medication was helping, and his hygiene improved.  *Id.*  Rubin's observations remained, generally, the same and his impression was that Rees was "coping better."  (Tr. 835).

On January 10, 2019, Rees saw Dr. Khurana for a pharmacologic management session.  (Tr. 841).  Rees reported that his mood was depressed, but he was enjoying things a bit more, like playing video games.  *Id.*  Rees indicated that he had decreased motivation, poor grooming, poor hygiene, and feelings of hopelessness, worthlessness, and helplessness.  *Id.*  He also reported that his sleep increased, energy was low, appetite and concentration were okay, and social anxiety had decreased, indicating he had felt okay sitting in the waiting area.  *Id.*  He stated that he worried about what would happen to him if his mother passed away and denied any recent panic attacks.  *Id.*  He also indicated that he had thoughts that he would be better off not here but did not have any intent or plans to hurt himself.  *Id.*  He remained sober, was compliant with his medications, and his therapy with Rubin was going well.  *Id.*

Dr. Khurana's observations remained the same.  (Tr. 841-842).  His diagnostic impression was that Rees's mood was depressed with anhedonia, decreased energy, and feelings of hopelessness, helplessness, and worthlessness.  (Tr. 842).  He also found that Rees had chronic passive suicidal ideation and was still experiencing anxiety, although it and his sleep had improved.  *Id.*  His diagnoses remained unchanged.  *Id.*

On February 13, 2019, Rees saw Rubin for a counseling session.  (Tr. 848).  Rees reported that he had stopped taking Wellbutrin due to increased anxiety but that he had been able

10

to enjoy video games more.  *Id.*  Rubin's observations were, generally, the same and his clinical impression was that Rees was "coping better, mildly." (Tr. 849).

On March 29, 2019, Rees saw Rubin for a counseling session.  (Tr. 863).  Rubin noted that Rees had progressed towards his goals.  *Id.*  Rees reported that he had higher anxiety and trouble sleeping recently, but he had spoken to his physician about it.  *Id.*  He also noted some increased depression and that he felt the increased hydroxyzine had contributed to the symptoms. *Id.*  Rubin recommended that the frequency of their visits increased, that Rees reduce the news he watched and drinking soda, and other coping mechanisms.  (Tr. 863-864).  Rubin's observations were, generally, the same.  (Tr. 864).  His clinical impression was that Rees had a recent increase in symptoms.  (Tr. 865).

On April 9, 2019, Rees was seen at St. John's Hospital's emergency department, complaining of anxiety.  (Tr. 871).  His primary assessment was that he was within normal limits.  (Tr. 872).  It was noted that he had a history of frequent panic attacks and anxiety, but that the episodes had increased in frequency without a specific trigger.  (Tr. 873).  Rees reported that his last panic attack was about an hour prior to arriving at the hospital and he would have shortness of breath and nausea during the attacks.  *Id.*  He reported that he was depressed but he did not want to end his life.  *Id.*  A review of his symptoms indicated he had shortness of breath and nausea.  *Id.*  On physical examination, Rees was noted as being alert, oriented, anxious, and jittery, with normal speech and a flat affect.  (Tr. 873-874).  He was assessed with an anxiety disorder, instructed in management of his symptoms, and discharged.  (Tr. 874, 882).

On April 12, 2019, Rees returned to the emergency department for anxiety and was primarily assessed as being within normal limits.  (Tr. 886-887).  He reported that he had been feeling anxious, nervous, shaky, and having chest pains and his heart was racing, and his

psychiatrist told him to go to the emergency room.  (Tr. 888).  In a review of his symptoms, he indicated that he had chest pain and palpitations.  *Id.*  On physical examination, he was noted as anxious-appearing with an obvious tremor and appropriate mood and affect.  (Tr. 890-891).  He was prescribed Xanax, instructed to follow up with psychiatry, and discharged.  (Tr. 893).

On May 1, 2019, Rees saw Rubin for counseling.  (Tr. 906).  Rees reported that he had recently gone to the emergency room but was not admitted.  *Id.*  Since then, he felt "a little better," and was compliant with his medications.  *Id.*  Rubin indicated that Rees was progressing towards his goals, and recommended that he have more frequent appointments; more fun with his hobbies; allow panic sensations; cut down on news, scary shows, and pop; and other coping mechanisms.  *Id.*  Rubin's observations were unchanged.  (Tr. 907).  His clinical impression was that Rees was feeling better since being discharged from the emergency room.  (Tr. 908).

On May 9, 2019, Rees saw Krupa Pathak, M.D. for a pharmacologic management session.  (Tr. 911).  Rees reported that his mood was "anxious," his sleep and appetite had decreased due to anxiety, his energy was okay, his concentration was poor, and he had feelings of hopelessness, helplessness, and worthlessness.  (Tr. 912).  He also reported being sad because he never had a girlfriend and that his anxiety was worsening, noting he was worried about his finances and what would happen if his mother passed away.  *Id.*  He indicated that he had panic attacks 4 to 5 times per day and that Xanax was not helping.  *Id.*  His therapy with Rubin was going well, and he had decreased his soda intake.  *Id.*  He was compliant with his medications, but he was experiencing dry mouth.  *Id.*

Dr. Pathak observed that Rees had "good hygiene, poor hygiene, [was] overweight and [had a] large unkempt beard."  (Tr. 913).  He indicated Rees was restless, anxious in his behavior, and fully oriented.  *Id.*  He also noted that Rees had spontaneous, normal speech;

logical, organized thought processes; no evidence of paranoia, delusions, or perceptual disturbances; an anxious mood and an affect congruent with that; sustained concentration; normal memory; and fair judgment and insight. *Id.* Dr. Pathak's impression was that Rees appeared very anxious during the appointment and reiterated Rees's reported that some of his medications were not helping him. *Id.* Dr. Pathak discontinued Rees's Wellbutrin, started him on Klonopin for anxiety, and increased his Buspar dosage. *Id.* Dr. Pathak's diagnoses were consistent with prior diagnoses, except he did not include insomnia. *Id.*

From May 24 to August 9, 2019, Rees saw Rubin about once every two weeks for counseling. (Tr. 920, 926, 933, 939, 945, 951). Throughout that period, Rees reported that he had gone to a concert, had improved hygiene, was getting involved in music and videogames more, and had fluctuating anxiety and depression but, generally, his mood was improving. (*See* Tr. 920, 926, 933, 945, 951). Rubin's observations on Rees's mental status were largely the same, and his clinical impression was that Rees was coping better. (Tr. 921, 927, 934, 939-940, 945-947, 951-953).

On September 19, 2019, Rees saw Poorvanshi Alag, M.D., for a pharmacologic management session. (Tr. 968). Rees reported that his depression was getting better, his anxiety was bad, the Klonopin was helping, and it was better than Xanax and Ativan. (Tr. 969). He reported that the Buspar helped but it did not always feel like it. *Id.* He also reported feeling tired and sleeping a lot, which was sometimes difficult because of his anxiety, but, overall, it was "not too bad." *Id.* He indicated that he sometimes felt too anxious to eat and that he lived with his sister and her family, doing a lot of things with his nephew. *Id.* He also was cutting back on drinking soda. *Id.*

Dr. Alag observed that Rees was cooperative, calm, and fully oriented.  (Tr. 970).  He also indicated that Rees had average grooming; adequate hygiene; spontaneous, normal speech; organized and linear thought processes; no evidence of paranoia, delusions, or perceptual disturbances; a euthymic mood; a reactive affect; sustained attention and concentration; normal memory; and fair insight and judgment.  *Id.*  Dr. Alag's impression was that Rees's depression symptoms were in partial remission, his mood was stable, his anxiety was manageable, and he was tolerating his medication well.  *Id.*  He maintained the prior diagnoses.  (Tr. 971).

From September 27 to November 27, 2019, Rees continued to see Rubin about twice a month.  (Tr. 976, 982, 988, 994).  Rubin's records consistently noted that Rees was "significantly progressing" and experiencing improved symptoms.  (Tr. 976, 982, 988, 994).  Rubin's observations and impression of Rees's mental health status were largely unchanged.  (Tr. 977, 982-983, 989, 994-995).

On December 19, 2019, Rees saw Dr. Alag for a pharmacologic management session.  (Tr. 1000).  Rees reported that he had been doing good and taking his medication, but he had not been sleeping more than 2 to 4 hours a night and would nap during the day and evening.  (Tr. 1001).  He indicated that he still had some anxiety, but the Klonopin helped.  *Id.*  He reported staying home, except when out with his nephew; enjoying music and playing video games; having a fine appetite; and denied any depressive symptoms.  *Id.*  Dr. Alag's observations were, generally, the same as from Rees's prior appointment.  (Tr. 1002).  His impression was that Rees's depression symptoms were in partial remission, his mood was stable, and his anxiety was manageable.  (Tr. 1002-1003).  His diagnoses remained unchanged.  (Tr. 1003).

From January 15 to July 8, 2020, Rees saw Rubin about once a month for counseling.  (Tr. 1008, 1014, 1020, 1037-1038, 1043, 1050).  Rees, generally, reported that he was in a good

14

mood or that his anxiety was improving.  (*See* Tr. 1008, 1014, 1020, 1037-1038, 1044, 1051).
Rubin's observations and impression of Rees's mental health status were largely consistent with
his prior notes.  (Tr. 1009, 1015, 1021, 1038-1039, 1044-1045, 1051-1052).

### C.  Relevant Opinion Evidence

#### 1.  Function Report – Russell Rees

On April 2, 2018, Rees completed a function report.  (Tr. 282-289).  He indicated that his
conditions made it hard for him to be around people or to talk to them.  (Tr. 282).  He stayed in
the basement of the home he lived in and watched television.  (Tr. 283).  Even as a child, he had
social anxiety, but he had been able to work as a custodian prior to his heart failure.  *Id.*  He had
trouble sleeping, bathing regularly, and caring for his hair and beard, but otherwise was able to
care for himself.  *Id.*  He could make sandwiches and frozen dinners for himself and did so on a
daily basis.  (Tr. 284).  He did not do any household chores, explaining that he did not have the
desire to do anything.  (Tr. 284-285).  He could ride in and drive a car but would not go out
alone.  (Tr. 285).  His mother shopped for him, and, although he could count change, he
indicated he could not otherwise care for his finances because he had never lived on his own.  *Id.*

Rees indicated that his hobbies included playing video games and watching television,
which he did daily; he did not spend time with others.  *Id.*  He needed reminders to go to doctors'
appointments, and his mother would prepare his medication and remind him to shower.
(Tr. 284-285)*.*  He did not have problems getting along with others but struggled with social
anxiety.  (Tr. 287).  He reported that his depression and anxiety impacted his memory,
concentration, ability to complete tasks, and ability to talk to and get along with others.  *Id.*  He
indicated that he could not pay attention for long, he did not finish what he started, and he could
follow written but not spoken instructions well.  *Id.*  Rees reported that he got along with

authority figures, noting "I just keep to myself." (Tr. 288). He struggled with handling stress and changes to his routine. *Id.*

### 2.    Letter of Support – Roxanna Taketa (mother)

Roxanna Taketa, Rees's mother, submitted an undated letter in support of his son's application, indicating he had struggled with anxiety since childhood. (*See* Tr. 328-329).

### 3.    State Agency Consultants

On April 19, 2018, Karla Delcour, Ph.D., evaluated Rees's mental health limitations based on the record evidence. (Tr. 89-91). As to Rees's understanding and memory, Dr. Delcour found that Rees was not significantly limited except for his ability to understand and remember detailed instructions, which she found was moderately limited. (Tr. 90). As to Rees's concentration and persistence, Dr. Delcour found that Rees was moderately limited in his ability to (i) carry out detailed instructions, (ii) maintain attention and concentration for extended periods, and (iii) complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods (although he could perform without strict production quotas). *Id.* Dr. Delcour also found that, as to Rees's social interactions, he was moderately limited in his ability to (i) interact appropriately with the general public, (ii) accept instructions and respond appropriately to criticism from supervisors, and (iii) get along with coworkers or peers without distracting them or exhibiting behavioral extremes. (Tr. 91). Lastly, Dr. Delcour found that Rees was not significantly limited in his adaptation, except that he was moderately limited in his ability to respond appropriately to changes in the work setting. *Id.*

On August 15, 2018, Audrey Todd, Ph.D., reconsidered Rees's mental health limitations and affirmed Dr. Delcour's findings. (Tr. 105-107).

**D.      Relevant Testimonial Evidence**

**1.      2019 Hearing**

Rees testified at the hearing.  (Tr. 41-52).  He explained that he lived with his mother and

his stepdad.  (Tr. 41-42).  He had not worked for the past ten years, but he had previously

worked as a custodian.  (Tr. 42).  When he worked, he would have three days a week during

which his symptoms were debilitating.  (Tr. 44).  He had struggled with anxiety since he was in

school, even having tremors, and was working with a counselor.  (Tr. 43-44).  His anxiety was

not triggered by anything, as far as he could tell.  (Tr. 44).

Rees indicated that he had gone to the emergency room for a breathing issue, stating that

they provided him medication like Xanax and sent him home.  (Tr. 44-45).  He took a mix of

medications, which he did not notice any side effects from.  (Tr. 45-46).  He did not really ever

leave the house, except for appointments, and did not do much except watch television and talk

to his mother "a little bit."  (Tr. 46-47).  He could drive but his license had expired.  (Tr. 47-48).

Rees explained that he used to see his counselor, Rubin, less frequently but Rubin

increased the frequency of their sessions because he started having anxiety attacks every other

day.  (Tr. 48).  Rubin suggested he try to be more socially active, which he had not been able to

do, but he had been able to use Rubin's other suggested coping techniques.  (Tr. 49).  He

experienced intrusive thoughts daily, but some days were more severe than others.  (Tr. 50).

Rees indicated that he would have difficulty breathing and nausea at least once a week, as

intensely as when he had gone to the hospital.  *Id.*  He took Klonopin when he felt that way.  *Id.*

He had also been improving in his hygiene and had anxiety attacks about three times a week.

(Tr. 51).  He was unable to function, even in interacting with his family, more than half of the

days in a week.  (Tr. 52).  His mother helped him with his medication.  *Id.*  He had struggled

with substance abuse previously, and attended AA meetings, but he had not drunk in several years and no longer attended meetings.  *Id.*

### 2.    2020 Hearing

#### a.    Rees's Testimony

Rees testified at the second ALJ hearing.  (Tr. 62-76).  Rees explained that since his last hearing, he had not tried to get work, but he had practiced writing out his resume.  (Tr. 63).  He and his counselor agreed he was not ready to go back to work yet, but he practiced filling applications because he found that hard.  *Id.*  If he had an interview, he would sweat, shake, and be unable to concentrate.  (Tr. 63-64).  He experienced the same symptoms when he had been working and needed to talk to people.  *Id.*

Rees explained that he had lasted worked about 11 years prior.  (Tr. 64).  He believed in the past year since his prior hearing, his conditions have gotten worse.  (Tr. 65).  He indicated that he had 3 to 5 days a week where he experienced "real bad anxiety" and sometimes panic attacks.  *Id.*  He reported that his medication, therapy, and reading helped him cope "somewhat." *Id.*  He was sometimes uncomfortable around his family and would get scared for no reason. (Tr. 65-66).  His mother and sister helped with his expenses and went shopping for him.  *Id.*

Rees continued, explaining that he met with Rubin but was still "pretty much [a] shut in," as he was still not comfortable around people, and he would get anxious even inside.  (Tr. 67). He last experienced a full panic attack a few weeks prior to the hearing, noting he would feel that he was "going crazy," experience confusion, struggle to breath, and get hot or cold shakes. (Tr. 68).  His last attack lasted about eight hours.  (Tr. 69).  He also experienced "anxiety attacks," which he addressed with various coping mechanisms.  (Tr. 68-69).  He indicated that he was on medication, which his mother put in the pill boxes for him.  (Tr. 70).

Rees explained that he was close with his nephew and felt okay around him.  *Id.*  He reported, however, that he could occasionally go to a store, such as a drug store or a convenience store, but he still felt a little anxious and shaky.  (Tr. 71).  On days he had an anxiety attack, he would not go to the store.  *Id.*  He reported that his personal hygiene had improved, going from about a month between showers to showering a couple of times a week.  (Tr. 72).  He would not usually eat with his family, despite living with them, and even watching movies with them made him uncomfortable.  (Tr. 73).  He also did not sleep well, only sleeping about three or four hours before waking up again due to his anxiety.  (Tr. 74).  He explained that he when was scared, he would be triggered by a noise or something startling.  *Id.*  He reported taking his medication, meeting with his counselor, and following his counselor's recommendations to help reduce his anxiety.  (Tr. 75).  He also wanted to start exercising more but felt exposed doing so.  (Tr. 76).

### b.  Vocational Expert Testimony

During the hearing, Eric Dennison testified as a vocational expert.  (Tr. 58, 77-79).  He testified that a hypothetical individual limited to only brief and superficial interaction with the general public and coworkers, in addition to the other limitations posed by the ALJ in a hypothetical question, would be able to find work in the national economy.  (Tr. 77-78).  However, if that interaction was reduced to only slight to no interaction with the general public, coworkers, or supervisors, then the individual would not be able to work.  (Tr. 78).

## III.  Law & Analysis

### A.  Standard of Review

The court reviews the Commissioner's final decision to determine whether it was supported by substantial evidence and whether proper legal standards were applied.  42 U.S.C. § 1383(c)(3); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).  "Substantial

evidence" is not a high threshold for sufficiency.  *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154

(2019).  "It means – and means only – such relevant evidence as a reasonable mind might accept

as adequate to support a conclusion."  *Id.* (quotation marks omitted).  Even if a preponderance of

the evidence supports the claimant's position, the Commissioner's decision still cannot be

overturned "so long as substantial evidence also supports the conclusion reached by the ALJ."

*O'Brien v. Comm'r of Soc. Sec.*, 819 F. App'x 409, 416 (6th Cir. 2020) (quotation marks

omitted).  Under this standard, the court cannot decide the facts anew, evaluate credibility, or

re-weigh the evidence.  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003).  And "it

is not necessary that this court agree with the Commissioner's findings," so long as it meets this

low standard for evidentiary support.  *Rogers*, 486 F.3d at 241.  This is so because the

Commissioner enjoys a "zone of choice" within which to decide cases without being second-

guessed by a court.  *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Even if substantial evidence supported the ALJ's decision, the court will not uphold that

decision when the Commissioner failed to apply proper legal standards, unless the legal error

was harmless.  *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision .

. . will not be upheld [when] the SSA fails to follow its own regulations and [when] that error

prejudices a claimant on the merits or deprives the claimant of a substantial right.").  And the

court will not uphold a decision when the Commissioner's reasoning does "not build an accurate

and logical bridge between the evidence and the result."  *Fleischer v. Astrue*, 774 F. Supp. 2d

875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Charter*, 78 F.3d 305, 307 (7th Cir. 1996));

*accord Shrader v. Astrue*, No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1,

2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or

merely overlooked.").

### B.     Sentence Six Remand

Rees contends that remand is warranted pursuant to Sentence Six of § 205(g) of the Social Security Act because he had new and material evidence that the Appeals Counsel declined to consider.  ECF Doc. 10 at 10-13.  Although he acknowledges that he received the document the day after the record closed and that the ALJ's decision was issued after that date, he contends that the efforts he made to obtain the document earlier constituted good cause for not having provided it.  ECF Doc. 10 at 10-13.

The Commissioner contends that a Sentence Six remand is not warranted because the assessment was not "new" evidence, because Rees had the record before the ALJ issued his decision but failed to submit it.  ECF Doc. 11 at 8-10.  In his reply brief, Rees largely reiterates his arguments, noting that the ALJ indicated no further extensions for evidence.  *See* ECF Doc. 13 at 5-8.

A court may remand a case for the Commissioner to consider newly discovered evidence pursuant to Sentence Six of 42 U.S.C. § 405(g).  To obtain such a remand, the claimant must show that: (i) the evidence is new; (ii) the evidence is material; and (iii) good cause excuses the claimant's failure to incorporate the evidence into the record of a prior administrative proceeding.  42 U.S.C. § 405(g); *Casey v. Sec'y of Health & Hum. Serv.*, 987 F.2d 1230, 1233 (6th Cir. 1993).  "A sentence six remand is comparable to a Fed. R. Civ. P. 60(b) motion for a new trial based on newly discovered evidence."  *See Cranfield v. Comm'r of Soc. Sec.*, 79 F. App'x 852, 858 (6th Cir. 2003).  Evidence is "new" if it did not exist or was unavailable at the time of the administrative proceeding. *Finkelstein v. Sullivan*, 496 U.S. 617, 626 (1990).  And the Sixth Circuit takes a "harder line" approach to good cause – a claimant cannot simply point to the fact that the evidence was not created until after the ALJ hearing but must establish good

cause for why he did not cause the evidence to be created and produced until after the administrative proceeding. *See Perkins v. Apfel*, 14 F. App'x 593, 598-99 (6th Cir. 2001).

Rees has failed to establish that a Sentence Six remand is warranted. First, the evidence was not "new." Rees's counsel was fully aware of the assessment in issue *and was in possession of it* prior to the ALJ's decision being issued. *See* ECF Doc. 10 at 11. And district courts in this circuit have routinely interpreted the "administrative proceeding" language in *Finkelstein* to apply to the issuance of the ALJ's decision. *See Shauna S. v. Comm's of Soc. Sec.*, No. 1:20-CV-661, 2022 U.S. Dist. LEXIS 9945, at *15 (S.D. Ohio Jan. 18, 2022) ("For evidence to be new for purposes of Sentence Six, it must not only post-date but also have been unavailable to plaintiff prior to the ALJ's decision."); *Ash-Shakoor v. Comm'r of Soc. Sec.*, No. 1:21-CV-98, 2022 U.S. Dist. LEXIS 51056, at *20-22 (W.D. Mich. Mar. 22, 2022) (denying remand as plaintiff had not explained how the record available before the hearing met Sentence Six's other requirements); *Henderson v. Comm'r of Soc. Sec.*, No. 1:19-CV-2913, 2020 U.S. Dist. LEXIS 238628, at *34-36 (N.D. Ohio Nov. 24, 2020) ("[A]ccepting [the plaintiff's] alleged timeline directs the conclusion that the records were available to [the plaintiff] approximately 12 *or more* days *before* the ALJ issued his November 17, 2017 decision. [] Therefore, applicable law requires us to conclude that [the plaintiff's] new evidence is not "new."); *Loc v. Comm'r of Soc. Sec.*, No. 18-10514, 2019 U.S. Dist. LEXIS 43736, at *21-24 (E.D. Mich. Feb. 28, 2019) (noting that some of the documents at issue were ambiguous as to whether they were created after the ALJ's determination). Thus, because Rees had the document in his possession and could have submitted it – or requested leave to do so – well before the ALJ's decision, it was not "new." *See Finkelstein*, 496 U.S.at 626.

For the same reason, Rees's argument for the existence of "good cause" also fails.  Rees contends that his repeated efforts to obtain the record, coupled with the ALJ's indication that no further extensions for evidence would be provided, was enough to show that Rees had good cause for not providing the record.  *See* ECF Doc. 10 at 11; ECF Doc. 13 at 5-6.  Nevertheless, even if Rees had to go the extra mile to obtain the Rubin report (and might have had good cause for not submitting the record before the deadline), because he still had the opportunity to submit the evidence before the ALJ issued his decision, Rees has no excuse for not submitting the evidence.  *See Perkins*, 14 F. App'x at 598-99.  Although it is understandable that Rees would not have wanted to submit his evidence one day later than the ALJ's deadline, Rees has not cited any case finding that failing to submit – or to request leave to submit – such evidence has been excused on good cause basis.

Because the evidence upon which Rees seeks a remand is not "new" and he has not established good cause, Rees has not established a basis for remand under Sentence Six.  *See Glasco v. Comm'r of Soc. Sec.*, 645 F. App'x 432, 435 (6th Cir. 2016) (stating that failure to establish any of the three elements of a Sentence Six remand is "fatal" to the request).

## C.    Step Four: Residual Functional Capacity

Rees contends that the ALJ's findings as to his mental health limitations were not supported by substantial evidence.  ECF Doc. 10 at 16.  He argues that the ALJ cited a very small portion of the record in support of his RFC and failed to indicate that he considered a host of other records which supported of greater mental health limitations.  *See* ECF Doc. 10 at 16-18.  Further, he argues that the ALJ's statement that there were no "psychiatric hospitalizations" in the record was erroneous as he twice visited the emergency room for panic attacks and anxiety.  ECF Doc. 10 at 18-19.  He also argues that the ALJ failed to properly comply with the Appeals

Council's instructions on remand to consider the records he provided, making no reference to them in his decision.  ECF Doc. 10 at 19.  The Commissioner disagrees.  ECF Doc. 11 at 4-7.  In his reply brief, Rees reiterates his arguments.  ECF Doc. 13 at 1-4.

At Step Four of the sequential evaluation process, the ALJ must determine a claimant's RFC by considering all relevant medical and other evidence.  20 C.F.R. § 416.920(e).  The RFC is an assessment of a claimant's ability to do work despite his impairments.  *Walton v. Astrue*, 773 F. Supp. 2d 742, 747 (N.D. Ohio 2011) (citing 20 C.F.R. § 404.1545(a)(1) and SSR 96-8p, 1996 SSR LEXIS 5 (July 2, 1996)).  "In assessing RFC, the [ALJ] must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'"  SSR 96-8p, 1996 SSR LEXIS 5.  Relevant evidence includes a claimant's medical history, medical signs, laboratory findings, and statements about how the symptoms affect the claimant.  20 C.F.R. § 416.929(a); *see also* SSR 96-8p, 1996 SSR LEXIS 5.

The ALJ failed to apply the proper legal standards in expressing himself concerning Rees's RFC, because he failed to provide sufficient explanation of his decision to allow for meaningful review.  42 U.S.C. § 1383(c)(3); *Rogers*, 486 F.3d at 241.  First, Rees contends that because that ALJ failed to discuss the records the Appeals Council ordered the ALJ to consider on remand, remand is warranted.  However, "[w]hether an ALJ complies with an Appeals Council order of remand is an internal agency matter which arises prior to the issuance of the agency's final decision."  *See Dishman v. Astrue*, No. 4:08-CV-58, 2009 U.S. Dist. LEXIS 76896, at *30 (E.D. Tenn. Aug. 11, 2009); *see also Brown v. Comm'r of Soc. Sec.*, No. 1:08-CV-183, 2009 U.S. Dist. LEXIS 14046, at *14 (W.D. Mich. Jan. 23, 2009).  By not remanding the case a second time, the Appeals Council apparently considered the ALJ's second decision to be compliant with its previous order.  *See Dishman*, 2009 U.S. Dist. LEXIS 76896, at *30.  Thus,

24

because the Appeals Counsel denied further review of the ALJ's decision following its initial
remand, the court cannot consider that argument.

As to the ALJ's RFC determination more generally, the ALJ erred because, based on the
limited evidence provided, the ALJ failed to provide sufficient evidence to allow for meaningful
review.  42 U.S.C. § 1383(c)(3); *Rogers*, 486 F.3d at 241.  The Commissioner is correct that Rees
has not challenged a specific limitation determined by the ALJ but rather challenges the ALJ's
discussion of all of his mental health limitations based on the lack of discussion provided.  *See* ECF
Doc. 10 at 13-20.  In support of the RFC limitations, the ALJ provided the following explanation:

> As for the claimant's statements about intensity, persistence, and limiting effects of his or
> her symptoms, they are inconsistent because his [mental status exams] show he is
> oriented, cooperative appropriate, well groomed, as having normal speech, as having
> sustained attention/concentration, and as being logical and organized.  There are no
> psychiatric hospitalizations and no criminal behaviors.

(Tr. 28).

Although the court looks to the ALJ's decision as a whole in determining whether
substantial evidence supported the ALJ's findings, even that provides little support in this case.
*See Buckhanon ex rel. J.H. v. Astrue*, 368 F. App'x 674, 678-79 (7th Cir. 2010) ("[W]e read the
ALJ's decision as a whole and with common sense.").  The ALJ's discussion of Rees's mental
health conditions at Step Three cited three select mental status examinations to support his
findings.  (*See* Tr. 26-27).  That's it.  And those were the only medical records – out of a 697-
page collection of medical records – to which the ALJ cited in his entire decision.  And the
majority of the medical records related to Rees's mental health care.  (*See* Tr. 21-31).

The records discussed by the ALJ support his RFC findings.  And many of the other
notes from Rubin are similar.  (*See e.g.*, Tr. 437, 444, 461, 468-469).  However, the ALJ's
decision did not discuss any of the notes taken by the psychiatrists Rees met with.  Some of these
providers observed that Rees was poorly groomed, depressed, had feelings of hopelessness,

helplessness, or worthlessness, and had anhedonia.  (*See* Tr. 804, 841-842, 913, 1002).  Nor did the ALJ's discussion account for Rees's two visits to the emergency department due to his anxiety (Tr. 871-874, 886-893), or his passive but near-constant suicidal ideations.  (*See* Tr. 408, 427, 451, 476, 804, 841).  It also does not address (or even acknowledge) the medical records and testimony indicating that Rees struggled with personal hygiene, rarely left his house, and was uncomfortable even around his own family.  (*See* Tr. 52, 65-66, 67, 72-73, 409, 451, 485, 841, 913).

In other cases, I have found that such skimpy explanations can survive the regulation's requirement that the ALJ must provide sufficient explanation in order to permit meaningful review.  *See e.g.*, *Smith v. Comm'r*, No. 3:21-CV-01151, 2022 U.S. Dist. LEXIS 116246, at *29-37 (N.D. Ohio June 30, 2022).  However, this case is distinguishable because, unlike those cases, the ALJ did not even cite the other records from which the court (or any reader) could infer that the records of the other doctors had been reviewed.  Although the records noted above do not uniformly undermine the ALJ's finding that Rees was limited to following simple tasks and instructions, they do speak to the issue of whether Rees was capable of occasionally interacting with the general public and coworkers.  Had Rees been found to be limited to only slight interactions, the vocational expert testified that Rees would not be able to work in available jobs in the national economy.  (*See* Tr. 78).  As a result, the failure to address these records prevented the court from conducting a meaningful review and is not harmless.  *See* *Bowen*, 478 F.3d at 746.

The Commissioner contends that the ALJ's discussion was sufficient because (i) Rees was not admitted during either hospital visit, (ii) the ALJ cited records from "numerous" counseling sessions, and (iii) the ALJ was not required to cite every piece of evidence.  *See* ECF Doc. 11 at 4-7.  It is true that the ALJ was not required to discuss *every* piece of evidence.  *See*

*Thacker v. Comm'r*, 99 F. App'x 661, 665 (6th Cir. 2004).  But that does not relieve the ALJ of

his obligation to consider *all* of the evidence in the record.  *See* 20 C.F.R. § 416.920(e); *Porter v.*

*Kijakazi*, No. 20-CV-2079, 2022 U.S. Dist. LEXIS 64358, at *38 (N.D. Ohio Feb. 7, 2022).  And

contrary evidence must be explained.  *See Rogers v. Comm'r of Soc. Sec.*, No. 5:17-cv-1087,

2018 U.S. Dist. LEXIS 68715 *44 (N.D. Ohio 2018) (citing *Minor v. Comm'r of Soc. Sec.*, 513

F. App'x 417, 435 (6th Cir. 2013)); *see also Fleischer v. Astrue*, 774 F. Supp. 2d 875, 881 (N.D.

Ohio 2011) (stating that, if a medical source's opinion contradicts the ALJ's RFC finding, the

ALJ must explain why he did not include the limitation in his RFC determination).  Without

some means of verifying that the ALJ actually reviewed this evidence, it is impossible to state

that the ALJ met his obligation to consider *all* of the record evidence, and there was no

discussion of the records that were to the RFC's limitations.  Because it is unclear whether the

ALJ met his obligations and the error undermines the ALJ's RFC, the ALJ's decision must be

remanded.

**IV.     Recommendation**

Because Rees has failed to show that his proposed evidence from Rubin was "new" and

that he had good cause for failing to provide it prior to the ALJ's decision, I recommend that his

request for a Sentence Six remand be denied.  However, because the ALJ failed to apply proper

legal standards in determining Rees's RFC, I recommend that the Commissioner's final decision

denying Rees's application for SSI be vacated and that Rees's case be remanded for further

consideration.

Dated: October 27, 2022

Thomas M. Parker

United States Magistrate Judge

_____

### Objections, Review, and Appeal

Within 14 days after being served with a copy of this report and recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the magistrate judge.  Rule 72(b)(2), Federal Rules of Civil Procedure; *see also* 28 U.S.C. § 636(b)(1); Local Rule 72.3(b).  Properly asserted objections shall be reviewed de novo by the assigned district judge.

* * *

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the report and recommendation.  *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019).  Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991).  Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 U.S. Dist. LEXIS 100383, *6 (W.D. Ky. June 15, 2018) (quoting *Howard*).  The failure to assert specific objections may in rare cases be excused in the interest of justice.  *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).